## APPEALS OF NORTHEASTERN OIL & GAS CO.

Docket Nos. 2231, 3525.   Decided October 30, 1926.

1. Amount of reduction of invested capital for the year 1918 by reason of exhaustion of franchises determined.

2. Deduction claimed by the taxpayer for the years 1918 and 1920 for exhaustion, wear and tear, and obsolescence approved.

3. Value of certain mineral and gas rights, and leaseholds determined for invested capital purposes.

*J. W. Reavis, Esq.*, and *H. H. Mihills, C. P. A.*, for the petitioner.
*A. H. Fast, Esq*, for the Commissioner.

Separate appeals involving different taxable years have been consolidated by consent. One appeal is from the determination of a deficiency in income and profits tax for 1918 in the sum of $43,986.25, and the other is from the determination of a deficiency in income and profits tax for 1920 in the sum of $2,391.64. The taxpayer alleges error on the part of the Commissioner in (1) reducing invested capital $77,400.95 for the year 1918, because of alleged depreciation sustained by the taxpayer prior to the year 1918 in addition to that charged off its books; (2) reducing the deduction claimed by the taxpayer for exhaustion, wear and tear, and obsolescence during the years 1918 and 1920 and thereby increasing the taxable income for those years; (3) eliminating from invested capital for 1918 the value of certain leaseholds and mineral and gas rights shown upon the taxpayer's books in the aggregate sum of $84,027.93; and (4) refusing to grant special relief for 1918 under the provisions of sections 327 and 328 of the Revenue Act of 1918.

### FINDINGS OF FACT.

1. The taxpayer is an Ohio corporation engaged in the business of distributing natural gas to a number of municipalities and townships in Ashtabula County, Ohio. It was organized in the year 1901 with a capital stock of a par value of $300,000. On December 1, 1913, all the stock of the taxpayer was purchased by one M. B. Daly for $570,000, the approximate net worth of the assets as shown by its books, the exact net worth so shown being $563,994.87. The taxpayer was operated by the said Daly at a profit for a number of years, but, owing to a shortage of the supply of natural gas, was forced to give up the franchise. On December 30, 1920, he sold the stock for $245,-000, which sum represented the book value of the assets at that date.

2. While the taxpayer obtained some of its natural gas from its own wells in Ohio, the principal source of supply was from the Clarion Gas Co., in Pennsylvania. At the time of the acquisition of the stock by Daly, the taxpayer had a 20 year contract with the Clarion Gas Co. to supply sufficient gas for its needs at the Ohio

state line. From this point the taxpayer built its own pipe lines and distributed the gas to its customers at the various municipalities and townships. The taxpayer had approximately 12,000 customers in 20 towns and townships. Until the year 1916, the supply of gas from the Clarion Gas Co. was ample, but commencing in 1916 the supply decreased in spite of constant and repeated demands for more gas. From 1916 on, the Clarion Gas Co., on account of exhaustion of its own gas fields, was unable to furnish sufficient gas to the taxpayer, and finally, in 1918, notified the taxpayer by letter that it would be necessary for the taxpayer to seek a supply elsewhere, as it was unable to supply the gas. In 1918 a new contract was entered into by the Clarion Gas Co. and the taxpayer, by the terms of which the old contract was canceled and the Clarion Gas Co. was only required to furnish sufficient gas to supply the Town of Andover, which was near the state line. The taxpayer thereupon took up the remaining pipe line connecting with the Clarion Gas Co. and sold it. The declining gas supply of the Clarion Co. is illustrated by the following records of gas supplied by it:

| Year. | Cubic feet of gas. |
|---|---|
| 1914 | 689, 147, 732 |
| 1915 | 514, 927, 034 |
| 1916 | 518, 391, 011 |
| 1917 | 95, 121, 242 |
| 1918 | 54, 587, 473 |
| 1919 | 43, 083, 127 |

3. The taxpayer, foreseeing the exhaustion of the supply of the Clarion Gas Co., on June 30, 1916, entered into a contract with the Commercial Oil & Gas Co., by the terms of which the taxpayer assigned certain of its leaseholds from which the Commercial Oil & Gas Co. was to develop and sell natural gas to the taxpayer. This gas field was from local wells in Ohio and was a limited supply. The experience of the Ohio gas fields in this vicinity was that the gas wells would be brought in at a high pressure but in a few years become depleted to a low pressure insufficient for commercial use. The entire local field was becoming exhausted and it was known that this source would not be available in a few years. The gas received from this source was as follows:

| Year. | Cubic feet of gas. |
|---|---|
| 1916 | 69, 767, 000 |
| 1917 | 976, 001, 000 |
| 1918 | 1, 174, 575, 100 |
| 1919 | 987, 516, 399 |
| 1920 | 334, 784, 135 |
| 1921 | 187, 898, 000 |
| 1922 | 125, 819, 000 |
| 1923 | 85, 045, 931 |

4. The taxpayer also obtained some natural gas from its own wells in the Ohio gas field. This source was also diminishing. It drilled five wells in 1917 and five more in 1919, but all were dry holes. The pressure in its producing wells was also decreasing to a point below commercial usage. This experience in producing gas is illustrated by the following statistics:

| Year. | Wells drilled. | Dry holes. | Abandoned. | Producing. | Amount produced. |
|---|---|---|---|---|---|
| 1913 (Dec. 1) | | | | 20 | |
| 1914 | 7 | 3 | 6 | 19 | 263, 565, 702 |
| 1915 | 13 | 5 | 9 | 17 | 452, 541, 570 |
| 1916 | 3 | 2 | 5 | 13 | 332, 061, 664 |
| 1917 | 5 | 5 | 4 | 9 | 134, 396, 779 |
| 1918 | 0 | 0 | 1 | 8 | 140, 956, 088 |
| 1919 | 5 | 5 | 0 | 8 | 168, 802, 510 |
| 1920 | | | | | 116, 757, 135 |
| 1921 | | | | | 61, 189, 301 |

5. The taxpayer, for the first time, in 1916, realized that the supply of natural gas available for its customers would terminate in a few years, and thereupon commenced to write off of its books depreciation, including obsolescence of its physical assets, as follows:

| | |
|---|---|
| 1916 | $24, 296. 87 |
| 1917 | 34, 694. 18 |
| 1918 | 73, 688. 92 |
| 1919 | 80, 000. 00 |
| 1920 | 70, 926. 57 |
| Total | 283, 606. 54 |

The Commissioner conceded the total amount, but allocated the same as follows:

| | |
|---|---|
| 1914 | $34, 299. 51 |
| 1915 | 34, 229. 51 |
| 1916 | 34, 229. 51 |
| 1917 | 34, 229. 51 |
| 1918 | 34, 229. 51 |
| 1919 | 34, 229. 51 |
| 1920 | 34, 229. 51 |
| | 239, 606. 57 |
| Exhaustion of franchise prior to 1914 | 44, 000. 00 |
| Total | 283, 606. 57 |

Included in the assets listed by the taxpayer in its balance sheet as of December 1, 1913, were franchises valued at $100,000. The Commissioner determined the life of these franchises, at the date of acquisition, to be 25 years, of which 11 years had expired prior to 1914.

6. In the year 1920, it appearing that the taxpayer was not obtaining sufficient natural gas to supply its customers, the Public Utilities

Commission of the State of Ohio granted permission to the taxpayer to discontinue service to seven municipalities and twelve townships and required it to continue service to but one municipality. This service was thereupon discontinued by the taxpayer. Daly then sold his stock for $245,000, the book value of the depreciated assets. The stock was purchased by certain citizens of one municipality as a matter of civic pride, and the company thereafter distributed artificial gas to that community.

7. The officials and the original organizers of the taxpayer and those having cognizance of its early transactions have since died, and the early books and records of transactions at that time were incomplete or unavailable. The balance sheet of the taxpayer as of December 1, 1913, is as follows:

*Balance Sheet*

ASSETS

| | |
|---|---:|
| Mineral & Gas Rights | [1] $17,500.00 |
| Franchises | 100,000.00 |
| Lands in Fee | 3,250.00 |
| Leaseholds | [1] 66,527.93 |
| Buildings | 1,908.25 |
| Tools over $25 | 2,282.50 |
| Office Furniture & Fixtures—Geneva | 261.36 |
| " " " " —Jefferson | 368.41 |
| " " " " —Conneaut | 1,224.32 |
| " " " " —Andover | 2.95 |
| Gas Receivers & Regulators | 1,737.50 |
| Gas Wells | 14,061.36 |
| Gas Meters | 38,568.35 |
| Pipe Lines—Main | 409,500.85 |
| " " —Field | 11,029.80 |
| Inventory—Conneaut | 2,613.25 |
| " —Markham | 8,792.56 |
| " —Geneva | 785.16 |
| " —Andover | 415.38 |
| Acct. Rec. A. W. Lewis | 59.92 |
| " " L. G. Anderson | 1.00 |
| " " B. Simmons | 13.00 |
| " " Conneaut | 7,052.37 |
| " " Geneva | 3,830.18 |
| " " Jefferson | 2,252.23 |
| " " Ashtabula Gas Co | 7,911.67 |
| Petty Cash Fund—Hunter | 100.00 |
| " " " —Reed | 250.00 |
| " " " —Webb | 200.00 |
| " " " —Cole | 100.00 |
| Monongahela National Bank | 1,311.71 |
| Total | $703,912.01 |

[1] Items in controversy.

LIABILITIES

| | |
|---|---|
| Unclaimed Vouchers | $20.00 |
| Worth Oil & Gas Co | 1,740.68 |
| Loan Account | 135,924.83 |
| Meter Deposits | 5.00 |
| Vouchers Payable | 2,336.63 |
| Capital Stock | 300,000.00 |
| Surplus | 238,512.23 |
| Current Profit & Loss (Detail attached) | 25,372.64 |
| Total | $703,912.01 |

NET WORTH—DEC. 1, 1913

| | |
|---|---|
| Capital stock | $300,000.00 |
| Surplus | 238,512.23 |
| Current Profit & Loss | 25,372.64 |
| Total | $563,884.87 |

In computing invested capital for the year 1918, the Commissioner disallowed the above item of $17,500 for mineral and gas rights, and $66,527.93 for leaseholds, on the ground of insufficient evidence of the cost. As to the two said items, the taxpayer has submitted the original vouchers as proof of the $17,500 item, and vouchers totaling $25,913.85 of the $66,527.93 item. The taxpayer had acquired leaseholds on approximately 8,000 acres of land and still had an equal amount in the year 1918. The taxpayer on its books had always carried the above items in the amounts as above set forth, both prior to December 1, 1913, and subsequently, and they were included as assets in its balance sheet of December 31, 1920.

8. The major portion of the physical assets of the taxpayer consisted of cast iron pipe lines, and immediately after the purchase of the stock of the taxpayer by Daly the pipe lines were put into a better state of repair and sums of money greatly in excess of normal maintenance were expended in improving the same. While the normal maintenance for prior years was approximately $7,000 per year, the taxpayer in 1914 spent $19,341.03, and in 1915, $29,998.74, in bettering this equipment. On account of these improvements, the taxpayer did not charge off depreciation for 1914 and 1915, but the Commissioner charged off $34,229.51 for each of those years, or a total of $68,459.02, which he deducted in computing invested capital for the year 1918. The Commissioner for the year 1916 also charged off depreciation in excess of that taken by the taxpayer, which resulted in a further decrease of invested capital for the said year 1918.

OPINION.

MORRIS: The total depreciation charged off by the taxpayer on its books to December 31, 1917, amounted to $58,991.05. The Com-

missioner has determined that the total depreciation sustained to the same date amounts to $136,918.04, and, therefore, he has reduced the taxpayer's invested capital by the amount of $77,926.99 (the amount set out in the petition is $77,400.95), because of depreciation alleged to have been sustained in years prior to 1918, and which the taxpayer failed to write off on its books of account. The total depreciation of $136,918.04, which the Commissioner alleges was sustained to December 31, 1917, was determined by him in the following manner:

| | |
|---|---:|
| Total depreciation deducted on the books to December 31, 1920____ | $283, 606. 54 |
| Deduct: Depreciation on franchises 1903 to 1920, 18 years at $4,000 per annum_____ | 72, 000. 00 |
| Depreciation sustained from 1914 to 1920, 7 years_____ | 211, 606. 54 |
| Annual depreciation deduction (1/7 of $211,606.54_____ | 30, 229. 51 |
| Add: Annual deduction for amortization of franchises_____ | 4, 000. 00 |
| Total annual deduction_____ | 34, 229. 51 |
| Total depreciation sustained 1914 to 1917, 4 years_____ | 136, 918. 04 |

It will be noted from the foregoing that the Commissioner has arbitrarily spread the total depreciation allowance charged off on the taxpayer's books, to the end of 1920, ratably over the seven-year period 1914 to 1920, inclusive, although the proven facts are that the depreciation was not actually sustained in equal annual amounts and that no depreciation was sustained in the years 1914 and 1915. The taxpayer charged off no depreciation in the years 1914 and 1915, because of the large amounts it had spent in those years in bettering its equipment and which it had charged to expense on the books of account. While, in years prior to 1914, its average annual expenditure for betterment and maintenance of equipment was approximately $7,000, in the years 1914 and 1915 it expended for these purposes the sums of $19,341.03 and $29,998.74, respectively. The taxpayer considered that the expenditure of these amounts and the charging thereof to expense was sufficient to take care of any depreciation sustained during those years, and, hence it charged off no depreciation specifically as such in those years. In 1916 the impending shortage and approaching end of the source of supply of natural gas became apparent to the taxpayer. That the shortage was imminent and the time of suspension of operations could be foreseen, was not mere guesswork but was based upon experience, statistics, figures and facts from both private and public sources. From that year on, the taxpayer charged off annually increasing amounts to take care of not only the actual wear and tear suffered by its physical assets, but also the impending obsoleteness which was overtaking these assets and extinguishing their value before the expira-

tion of their normal useful life. Thus it is apparent from these facts that any arbitrary spread of the total depreciation taken on the taxpayer's books, during the period 1916 to 1920, inclusive, ratably over the period 1914 to 1920 as the Commissioner has done, is unwarranted and not in consonance with the actual facts.

However, it appears that the taxpayer had not, prior to 1916, charged off on its books any depreciation of franchises. These franchises were acquired in 1903 and had a value, at the date of acquisition, of $100,000. The Commissioner has determined that the life of these franchises at the date of acquisition was 25 years, and this has not been rebutted by the taxpayer. It is apparent, therefore, that at the close of the year 1915, 13 years of the life of these franchises had expired. By the very nature of these franchises, they are invariably subject to exhaustion because the life thereof is of limited duration. Unlike exhaustion in the case of such items as machinery and equipment, which may be arrested through betterments and replacements, exhaustion in the case of franchises is definite and certain and can not be stayed. The passing of each year means the franchises have one year less of life to run and marks a proportionate loss of the capital invested in them. In the case of the franchises under consideration, the annual loss of capital occasioned by exhaustion is $4,000, and the accumulated exhaustion from 1903 to the close of 1915, a period of 13 years, was $52,000, which must be reckoned with in the computation of invested capital. Whether provision was made for exhaustion of franchises in the depreciation written off by the taxpayer for the years 1916 and 1917, we do not know. The Commissioner offered no affirmative evidence that the depreciation written off in those years was not sufficient to take care of such exhaustion; and, certainly, the method he adopted in determining the allowances to be made for depreciation in those years, affords no proof of the reasonableness or the adequacy of the deductions made by the taxpayer.

The foregoing leads us to the conclusion that the Commissioner was justified in reducing taxpayer's invested capital for the year 1918 to the extent of $52,000, because of inadequate depreciation charged off by the petitioner on its books, through failure to make provision for exhaustion of franchises; and, since the reduction made by the Commissioner for inadequate depreciation is $77,926.99, the invested capital, as he has determined it to be, should be increased $25,926.99.

For the years 1918 and 1920, taxpayer claimed deductions in its returns for depreciation in the respective amounts of $73,688.92 and $70,926.57. The Commissioner has allowed a depreciation deduction for each year in the amount of $34,229.51, determined in the manner heretofore outlined, disallowing the amounts in excess

thereof, thereby increasing the net income of the years 1918 and 1920 by the amounts of $39,459.41 and $36,697.06, respectively. The taxpayer contends that the allowances made by the Commissioner are clearly the result of an arbitrary mathematical allocation with no consideration of the facts and conditions as they existed at the time. It is further pointed out that the Commissioner has given no consideration to the impending obsoleteness, first ascertained in 1916, which was overtaking the physical assets and extinguishing their value before the expiration of their normal useful life. We are of the opinion that the evidence clearly sustains the contentions of the taxpayer in this respect. It seems more logical and more in harmony with the proven fact that the greater losses in value obtained with the impending shortage and approaching end of the source of supply of natural gas. As we have heretofore pointed out, the taxpayer, because of experience, statistics, figures and facts, from both private and public sources, was in a position definitely to foresee the imminent shortage of natural gas and the suspension of operations. The beginning was in 1916, when the principal source of supply of the Clarion Gas Co. of Pennsylvania commenced to fail and forced the taxpayer to rely on local gas fields, the limit of which it already knew through experience with its own gas wells, and the end was officially determined by the Public Utilities Commission of the State of Ohio, which recognized the physical impossibility of obtaining natural gas and permitted the taxpayer to give up its service. The Commissioner has offered no logical basis for the computation of the allowances for depreciation which he has made for these two years. The amounts do not purport to be based upon the useful life of the property; while no consideration whatever has been given to the above related facts. He has simply taken the total depreciation charged off on the petitioner's books over the period 1916 to 1920, and ratably spread the same over the period 1914 to 1920. Upon the evidence before us, we are of the opinion that the depreciation deductions claimed by the petitioner for the years 1918 and 1920, are reasonable in the light of the conditions obtaining and we are not disposed to disturb them in the absence of affirmative evidence to the contrary.

The taxpayer claims that the Commissioner erroneously excluded from invested capital for 1918, the following items:

| | |
|---|---|
| Mineral and gas rights | $17,500.00 |
| Leaseholds | 66,527.93 |
| Total | 84,027.93 |

The taxpayer was unable to furnish the Commissioner affirmative proof of the cost of these assets. At the hearing, however, the taxpayer succeeded in producing the original voucher for the $17,500

item and other vouchers covering $25,913.85 of the $66,527.93 item. These items appear to have been carried upon the books of the taxpayer continuously at their full face value. They show up in the balance sheet of December 1, 1913, as shown in our findings of fact, and they appear in the balance sheet of December 31, 1920, as an asset and are included in the value of the assets of the taxpayer when the stock was sold by Daly. Though the taxpayer was unable to specify the precise assets they represented, it was undisputed that it had in fact leaseholds of approximately 8,000 acres of land and numerous gas and mineral rights. In view of the fact that these assets have always been taken at their full value by all parties dealing with the taxpayer and it has always without controversy carried them upon its books, and the further fact that original vouchers have been discovered covering a portion of the full amounts, we are disposed to give full credence to the entries on the books as to the cost of these assets and allow them as invested capital, subject to reduction for any accumulated exhaustion.

The taxpayer petitions that for the year 1918 it be given special relief under section 328 of the Revenue Act of 1918. It has failed to show the existence of any abnormality affecting capital or income that would bring it within section 327(d). Its contention that invested capital can not be satisfactorily determined is not supported by the evidence. The Commissioner determined invested capital from the taxpayer's books of account, and it has not been shown that the books do not correctly reflect the invested capital.

*Judgment will be entered on 10 days' notice, under Rule 50.*

STERNHAGEN dissents in part.